IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:13-CV-125-D

JILL C. MCCABE, )
 )
         Plaintiff, )
 )
v. ) **ORDER**
 )
ABBOTT LABORATORIES, INC., )
 )
         Defendant. )

On February 20, 2013, Jill C. McCabe ("McCabe" or "plaintiff") sued her former employer Abbott Laboratories, Inc. ("Abbott" or "defendant") and makes three claims concerning her 2011 and 2012 incentive compensation: (1) breach of contract; (2) a violation of the North Carolina Wage and Hour Act ("NCWHA"), N.C. Gen. Stat. §§ 95-25.1–95-25.25; and (3) unjust enrichment. See Compl. [D.E. 2]. On February 14, 2014, Abbott moved for summary judgment [D.E. 25]. On March 14, 2014, McCabe responded in opposition [D.E. 30]. On March 31, 2014, Abbott replied [D.E. 43]. As explained below, the court grants Abbott's motion for summary judgment.

I.

McCabe was an Abbott pharmaceutical sales representative in Raleigh, North Carolina. See McCabe Dep. [D.E. 27-1] 22–26. McCabe worked for Abbott from October 2003 until she resigned in May 2012. Id. 20; Oudal Dep. [D.E. 44-1] 8. Beginning in 2010, Yolanda Lindsay was McCabe's supervisor and district manager. McCabe Dep. 21; Lindsay Dep. [D.E. 27-2] 7, 23–24. McCabe's regional manager was Christine Mueller. McCabe Dep. 47. Mueller's supervisor was Medgar Williams, the national sales director. Id.

McCabe was responsible for selling Humira, an Abbott drug, in eastern North Carolina. Id. 22–26. From 2010 to 2012, McCabe worked with another Abbott sales representative, Joy Gordon, to sell Humira. See id. 25–28. In 2011 and 2012, Abbott compensated McCabe with a base salary of approximately $110,000 and the possibility of quarterly incentive bonuses. See id. 34, 37, 61, 122–23; McCabe Dep. Exs. 7, 22; Brooks Decl. [D.E. 28] ¶¶ 7–8, Exs. A–B; Lindsay Dep. 48–49, 52.

In 2011 and 2012, Abbott's sales representatives were eligible for quarterly incentive payments pursuant to Abbott's Sales Incentive Eligibility and Program Criteria documents. See McCabe Dep. 31–32, 175; McCabe Dep. Exs. 6, 37; Brooks Decl. ¶ 7, Exs. A–B. Under Abbott's Sales Incentive Eligibility and Program Criteria documents ("criteria documents"):

> All payouts or awards discussed herein are discretionary. Any amounts, percentages, or particular awards discussed are presented as guides, not as guarantees. Abbott reserves the right in its sole and absolute discretion whether any payout, payout amount, or award is issued under any program.

Brooks Decl. ¶ 7, Ex. A (section 1 with heading "Introduction"). Abbott's criteria documents also discussed "data anomalies" and stated:

> There are no minimum or maximum payout or award limits for Sales Bonuses, unless otherwise noted in your specific sales force bonus plan. However, unanticipated data anomalies or business developments may arise that may affect payout amounts. The amount or method of calculation of any Sales Bonus is discretionary, along with the decision as to whether any payout or award should be issued.

Id. (section 3 with heading "Payout Limit or Modifications"). Abbott's criteria documents also addressed employment eligibility requirements concerning incentive-compensation payments. Specifically, Abbott's criteria documents stated: "Except as specifically provided in these guidelines, an employee who is not actively employed, or on active payroll on the payout date for any reason, as determined by [Abbott], is not eligible for and will not have earned a Sales Bonus."

2

Id. (section 3 with heading "Eligibility Requirements – General").

Abbott sales representatives had targets, or quotas. See McCabe Dep. Ex. 7; Oudal Dep. 19, 21; Lindsay Dep. 257–58; Brooks Decl. ¶ 8, Ex. C. The bonus calculation initially depended on whether a sales representative met the quota for her territory. See McCabe Dep. Ex. 7; Oudal Dep. 19, 21; Brooks Decl. ¶¶ 7–8, Exs. A–C. In 2011 and 2012, if a sales representative did not attain 91% of the her quota, she was not eligible for a quarterly bonus. See McCabe Dep. Ex. 7; Brooks Decl. ¶ 8, Ex. C (AMcCabe 000558); Oudal Dep. 19, 21.

In 2011 and 2012, Abbott based the sales representatives' quotas on individual territory and national historical product sales. See McCabe Dep. Ex. 7; Brooks Decl. ¶ 8, Ex. C. For Humira prescriptions, Abbott received the sales data that it used to calculate quarterly incentive payments primarily from a third-party vendor, IMS. See McCabe Dep. 50, 124–25; Brooks Dep. [D.E. 44-2] 13–17. Some pharmacies, however, did not provide their sales data to IMS. If a so-called non-reporting pharmacy had over $1.5 million in annual Humira sales, Abbott obtained the prescription data directly from that pharmacy. See Brooks Dep. 15–16, 39. If Abbott did not collect sales data directly from a non-reporting pharmacy, Abbott did not include such sales in a quarterly bonus calculation. See id. 29–31. McCabe knew that she sometimes called on non-reporting pharmacies and might not receive sales credit for sales from such pharmacies. See McCabe Dep. 133–37.

In May 2011, IMS announced a national data issue that affected the pharmaceutical industry. See McCabe Dep. 166–67; McCabe Dep. Ex. 27. Specifically, IMS announced that a major pharmacy had stopped reporting its prescription sales data to IMS pending a contract renegotiation. See Brooks Dep. 123–24. Thus, IMS estimated the missing data for the first quarter ("Q1") of 2011. See id.; McCabe Dep. Ex. 27. IMS gave Abbott the option of getting the retrospective corrected data once the contract was renegotiated. See Brooks Dep. 123–25; McCabe Dep. Ex. 27. In order not

3

to delay bonus payments for Q1 2011, which were scheduled for June 9, 2011, Abbott decided to pay the quarterly bonus provisionally, at 70% based on the estimated data, and then to recalculate the bonus with the corrected data. See McCabe Dep. Ex. 27. Abbott told the sales representatives (including McCabe) that any overpayment based on inaccurate estimated data would be carried forward and deducted from future bonus payments. See McCabe Dep. 166–67; McCabe Dep. Ex. 27. In June 2011, Abbott used the estimated data and paid McCabe $4,997.61 for the Q1 2011 bonus. See McCabe Dep. 171; McCabe Dep. Exs. 30–31.

When Abbott received the corrected data from IMS in July 2011, Abbott determined that McCabe had not met 91% of her quota; therefore, McCabe was ineligible for a Q1 2011 bonus. See McCabe Dep. 78–79, 171; McCabe Dep. Exs. 7, 27, 30. As such, McCabe had a negative balance of $4,997.61 for incentive compensation for Q1 2011. McCabe Dep. 165–66. Furthermore, McCabe did not meet 91% of her quota in Q2, Q3, or Q4 of 2011; therefore, she did not receive a bonus in those quarters. See id. 78–79, 166, 171–72; McCabe Dep., Exs. 31–33. Moreover, McCabe's negative balance from Q1 2011 carried over into 2012. See McCabe Dep. 78–79, 166; McCabe Dep. Ex. 27.

On July 1, 2011, Blue Cross and Blue Shield of North Carolina ("BCBSNC") implemented a mandatory specialty pharmacy network program and mandated that its insureds fill their Humira prescriptions at certain non-retail, specialty pharmacies. See McCabe Dep. 144–45; Lindsay Dep. 67; Brooks Dep. Ex. 5. A non-retail, specialty pharmacy administers specific medications, educates patients, and offers comprehensive support in distributing drugs that are high cost, complicated to use, and used to treat complex conditions. See Brooks Decl. ¶ 6. Abbott anticipated that the BCBSNC specialty-pharmacy mandate would result in BCBSNC insureds receiving Humira at such non-retail, specialty pharmacies. Abbott was concerned that IMS data would not include Humira

4

sales from the twelve known BCBSNC non-retail, specialty pharmacies. See Brooks Dep. 28–31, 83; Brooks Dep. Exs. 5, 10.

Mueller asked Abbott's sales information management group to investigate how the BCBSNC specialty-pharmacy mandate might impact the ability to collect sales data needed to calculate incentive compensation. See Lindsay Dep. 213–14; Brooks Decl. ¶ 5. Kristin Brooks, a manager in Abbott's sales information management group, led the investigation. See Brooks Dep. 9–13, 86–87, 125–27; Brooks Decl. ¶ 4. The investigation revealed that Kerr Specialty Pharmacy was the only pharmacy on the known list of BCBSNC's specialty pharmacies that was a non-reporting pharmacy. See Brooks Dep. 84–85, 94, 96–97. At that time, Kerr Specialty Pharmacy's sales volume did not meet Abbott's $1.5 million annual Humira sales threshold for receiving such data from a non-reporting pharmacy. See Brooks Dep. 22–23; Brooks Dep. Ex. 10.

In July 2011, McCabe asked Lindsay why the Humira sales from Kerr Specialty Pharmacy were not included in incentive-compensation calculations. See McCabe Dep. 50–51. Abbott then began investigating the effect of Kerr Specialty Pharmacy's sales on specific territories in eastern North Carolina. See Lindsay Dep. 168–69, 214–18, 222–23, 232–33; Brooks Dep. 29–30, 47, 50. Brooks also led this second investigation. See Brooks Dep. 34, 54–55.

Brooks decided to investigate the Kerr Specialty Pharmacy issue on a statewide basis instead of limiting the investigation to territories in eastern North Carolina. See id. 52, 70, 101–02. Brooks expanded the investigation because (1) the majority of sales representative in the Charlotte District, not just McCabe, were not attaining 91% of their quota, and (2) physicians statewide seemed to be referring patients to Kerr Specialty Pharmacy to fill Humira prescriptions. See id. 101–02; Lindsay Dep. 37–38, 166, 170–71, 222–23, 241–43; McCabe Dep. 151–52; McCabe Dep. Ex. 20. Brooks also focused the investigation on the second half of 2011, due to the perceived effect that the July

5

2011 BCBSNC specialty-pharmacy mandate had on data that Abbott was receiving. See Brooks Dep. 74–75, 79–80.

Abbott sought to obtain sales data directly from Kerr Specialty Pharmacy. See id. 88, 91–92. On December 15, 2011, the Abbott sales information management group received the Kerr Specialty Pharmacy data. See id. 19–20; Brooks Dep. Ex. 10. In January 2012, the Abbott sales information management group determined that adding the Kerr Specialty Pharmacy data did not account for the prescription-volume loss in North Carolina. Brooks Dep. 88–91, 97–100, 106–07, 130–31; Brooks Dep. Ex. 3; Lindsay Dep. 166–67; 207–08, 278, 301–02. Mueller then surmised that there must be other non-reporting specialty pharmacies. See Brooks Dep. Ex. 3.

Abbott faced an internal deadline of January 24, 2012, to finalize data for 2011 rankings and bonus awards for sales representatives. See Brooks Dep. 130–31; Brooks Dep. Ex. 5. Because Abbott lacked what it perceived to be all the necessary sales data, it decided to use a reverse-trending methodology with twelve months of sales preceding the July 2011 BCBSNC mandate (i.e., July 2010 to June 2011) to project the missing volume of sales in order to address the unresolved data anomalies. See Brooks Dep. 72–74, 83–86, 130–31; Lindsay Dep. 241–43, 249–50, 301–02; Oudal Dep. 41–44. After finishing its reverse-trending-methodology analysis, Abbott determined that McCabe still would not have obtained 91% of her quota. See Oudal Dep. 10; Lindsay Dep. 297. Thus, McCabe did not receive any incentive compensation for Q3 or Q4 in 2011. See McCabe Dep. Exs. 32–33.

In mid-February 2012, Abbott learned that IMS would not be collecting data from Kerr Specialty Pharmacy. Thus, Abbott began the process of obtaining a data contract in order to get the data directly from Kerr Specialty Pharmacy. See Brooks Dep. Ex. 10. In July 2012, Abbott received all of the Kerr Specialty Pharmacy data, and Abbott has credited the Kerr Specialty Pharmacy data

6

in its incentive-compensation calculations since Q4 2012. See Brooks Dep. 20–21, 63–65.

On May 9, 2012, McCabe gave notice of her resignation, effective May 25, 2012. See McCabe Dep. 20–21; McCabe Dep. Ex. 3. McCabe's last day on Abbott's payroll was May 30, 2012. See Oudal Dep. 8. Abbott paid the Q1 2012 bonus payment on May 24, 2012. See Lindsay Dep. 308–09. McCabe, however, did not receive a Q1 2012 bonus because Abbott applied the amount otherwise payable in Q1 2012 to McCabe's outstanding overpayment balance from Q1 2011. See Lindsay Dep. 310–11; McCabe Dep. Ex. 34.

Abbott made the North Carolina reverse-trending payout for Q1 2012 (i.e., the post-pay adjustment payout) on June 7, 2012. See Oudal Dep. 8–10, 12; Brooks Decl. ¶ 9, Ex. D. McCabe, however, was not on the payroll on June 7, 2012. Accordingly, pursuant to the criteria documents, McCabe did not receive a payment under Abbott's reverse-trending-payout analysis. See Oudal Dep. 6–8; Brooks Decl. ¶¶ 7–8, Exs. A–C; McCabe Dep. 37–38.

On February 20, 2013, McCabe filed suit against Abbott alleging breach of contract, a violation of the NCWHA, and unjust enrichment concerning her failure to receive incentive compensation in 2011 and 2012. The parties engaged in extensive discovery. After discovery closed, Abbott filed a motion for summary judgment on all three claims.

II.

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. See, e.g., Fed. R. Civ. P. 56, Scott v. Harris, 550 U.S. 372, 378 (2007); Celotex Corp. v. Catrett, 477 U.S. 317, 325–26 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–55 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986). The moving party bears the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact.

7

See Celotex Corp., 477 U.S. at 325. Once the moving party has met its burden, summary judgment is appropriate unless the nonmoving party can affirmatively demonstrate that there exists a genuine issue of material fact for trial. See Matsushita, 475 U.S. at 587. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. Conjectural arguments will not suffice. See id. at 249–52; Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party . . . cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Nor will a "mere . . . scintilla of evidence in support of the [nonmoving party's] position . . . be []sufficient; there must be evidence on which the jury could reasonably find for [the nonmoving party]." Anderson, 477 U.S. at 252; see Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996).

In order to prove breach of contract under North Carolina law, a plaintiff must prove (1) the existence of a valid contract, and (2) breach of the terms of the contract. See Poor v. Hill, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000); Jackson v. Carolina Hardwood Co., 120 N.C. App. 870, 871, 463 S.E.2d 571, 572 (1995); McLamb v. T.P. Inc., 173 N.C. App. 586, 588, 619 S.E.2d 577, 580 (2005), disc. rev. denied, 360 N.C. 290, 627 S.E.2d 621 (2006). For a contract to be formed, a definite "offer must be communicated, must be complete, and must be accepted in its exact terms." Yeager v. Dobbins, 252 N.C. 824, 828, 114 S.E.2d 820, 824 (1960). To be enforceable, a contract requires assent, mutuality, and definite terms. See Horton v. Humble Oil & Ref. Co., 255 N.C. 675, 679, 122 S.E.2d 716, 719 (1961). "A bonus offered by an employer to encourage more efficient service by an employee is an enforceable supplementary contract even though the bonus may be measured by earnings or productivity rather than by a fixed sum." Buchele v. Pinehurst Surgical Clinic, P.A., 80 N.C. App. 256, 261, 341 S.E.2d 772, 775, aff'd, 318 N.C. 503, 349 S.E.2d 579

8

(1986) (per curiam). However, when an employer retains total discretion concerning whether to pay a bonus, there is no mutual agreement and no contract. See, e.g., Schoenberg v. E.I. DuPont DeNemours & Co., No. 1:97CV109, 1997 U.S. DIST. LEXIS 18331, at *11–12 (W.D.N.C. Oct. 9, 1997) (unpublished) (applying North Carolina law), aff'd, 155 F.3d 561, 1998 WL 390613, at *2–3 (4th Cir. 1998) (per curiam) (unpublished table decision); Moore v. Associated Brokers, Inc., 9 N.C. App. 436, 437–38, 176 S.E.2d 355, 355–56 (1970) (applying North Carolina law); accord Jensen v. Int'l Bus. Machines Corp., 454 F.3d 382, 388 (4th Cir. 2006) (applying Virginia law).

Here, the Abbott criteria documents defeat McCabe's contention that she had a contract with Abbott obligating Abbott to pay incentive compensation to her in 2011 or 2012. Abbott's criteria documents state: "All payouts or awards discussed herein are discretionary. Any amounts, percentages, or particular awards discussed are presented as guides, not as guarantees. Abbott reserves the right in its sole and absolute discretion whether any payout, payout amount, or award is issued under any program." Brooks Decl. ¶ 7, Exs. A–B. Indeed, McCabe admits that no one at Abbott ever told her that incentive compensation was guaranteed. See McCabe Dep. 54–55. Thus, McCabe's breach of contract claim fails.

To the extent that McCabe contends that Abbott breached an oral contract concerning incentive compensation based on what Abbott managers said at sales meetings in 2011 and 2012 during the course of Powerpoint presentations, the oral presentations simply summarized the criteria documents. See McCabe Decl. [D.E. 32-1] ¶¶ 7, 9, 13, 15; McCabe Decl. Ex. 1. The quarterly bonus Powerpoint presentations stated:

> Abbott reserves the right to use reasonable business judgment to modify specific components of the payout calculation. The amount of any payout or award, as well as whether any payout or award is issued, will be determined by Abbott in its sole, absolute, and final discretion. Accordingly, performance achievement data are estimates only and are provided as a possible forecast. They should not be construed

9

as guarantees in any way. Final payouts will be determined at the conclusion of the measurement period, within Abbott's discretion. In the event of data anomalies, Abbott reserves the right to use reasonable business judgment to modify specific components of the payout calculation.

McCabe Decl. Ex. 1; McCabe Dep. Ex. 7; Brooks Decl. ¶ 8, Ex. C; see McCabe Dep. 33–36. Likewise, Lindsay's comments to her team in 2011 and 2012 concerning Abbott's ongoing investigation of data arising from the Kerr Specialty Pharmacy issue or the BCBSNC specialty-pharmacy mandate issue do not constitute an offer with definite terms. See, e.g., Schoenberg, 1998 WL 390613, at *2–3; Yeager, 252 N.C. at 827–28, 114 S.E.2d at 823; see also Jensen, 454 F.3d at 388; Schwarzkopf v. Int'l Bus. Machines, Inc., No. C08-2715 JF (HRL), 2010 WL 1929625, at *8–9 (N.D. Cal. May 12, 2010) (unpublished). Accordingly, McCabe's breach of contract claim fails.

In opposition to this conclusion, McCabe cites Morris v. Scenera Research, LLC., 747 S.E.2d 362 (N.C. Ct. App. 2013), and Salvaggio v. New Breed Transfer Corp., 150 N.C. App. 688, 564 S.E.2d 641 (2002). Each case, however, is distinguishable.

In Morris, unlike here, the bonus agreement did not vest total discretion in the employer. See Morris, 747 S.E.2d at 365. Rather, the employer in Morris agreed that the employee would receive his base salary and "up to $10,000 for each of his inventions on which [the employer] pursued patents, with $5,000 being earned when a patent application was submitted and $5,000 being earned when a patent issued." Id. at 365, 369–71. Further, unlike Abbott, the Morris employer had a history of paying bonuses to former employees after their employment ended. Id. at 368–69.

Likewise, in Salvaggio, the bonus agreement stated that the employee "will accrue a bonus of $12,000, less deductions, at the end of the first full year of employment. An additional $12,000 bonus, less deductions, will accrue at the end of the second year of employment. The full $24,000 bonus, less deductions, will be payable upon the conclusion of the second year of employment.

10

Salvaggio, 150 N.C. App. at 689, 564 S.E.2d at 642. The employee quit after fourteen months of employment and sued for the $12,000 bonus. Id. at 689, 564 S.E.2d at 642. The trial court held that the contract was ambiguous concerning whether the employee was entitled to a $12,000 bonus after one year of employment and held a bench trial. At trial, the employer conceded that if he had terminated the employee after one year, then the bonus agreement in the contract obligated the employer to pay the $12,000 bonus. The trial court held that the bonus agreement in the parties' contract gave the employee a vested right to a $12,000 bonus at the end of one year of employment. Id. at 691, 564 S.E.2d at 643–44. The North Carolina Court of Appeals affirmed. Id. at 691, 564 S.E.2d at 643–44. Unlike in Salvaggio, Abbott retained total discretion concerning whether to pay a bonus. Accordingly, the court grants summary judgment to Abbott on McCabe's breach of contract claim. In light of this conclusion, the court does not address Abbott's alternative argument that even if a contract existed, McCabe has failed to raise a genuine issue of material fact concerning a breach.

Next, the court addresses McCabe's NCWHA claim. Section 95-25.6 of the NCWHA states:

> Every employer shall pay every employee all wages and tips accruing to the employee on the regular payday. Pay periods may be daily, weekly, bi-weekly, semi-monthly, or monthly. Wages based upon bonuses, commissions, or other forms of calculation may be paid as infrequently as annually if prescribed in advance.

N.C. Gen. Stat. § 95-25.6. McCabe contends that Abbott violated the NCWHA by failing to pay her incentive compensation for 2011 or 2012. See Compl. ¶¶ 28–32.

As for McCabe's NCWHA claim concerning quarterly bonuses in 2011, the claim fails. First, when Abbott initially calculated quarterly bonuses in 2011, McCabe had failed to attain 91% of her quota, which was necessary to be eligible for a bonus. See, e.g., McCabe Dep. Exs. 7, 30–33; Oudal Dep. 42–44; Lindsay Dep. 297. Furthermore, even after Abbott's investigations concerning

11

the Kerr Specialty Pharmacy data anomaly, McCabe still did not attain 91% of her quota for Q3 or Q4 in 2011. See Lindsay Dep. 249–50, 297; McCabe Dep. Ex. 7. Thus, McCabe was not eligible for a bonus in 2011 under the Abbott criteria documents. Accordingly, Abbott did not violate the NCWHA in failing to pay McCabe a bonus for 2011.

As for McCabe's argument that Abbott should have used Kerr Specialty Pharmacy sales data to calculate her 2011 and Q1 2012 bonus, Abbott did not obtain all of the data from and enter into a contract with Kerr Specialty Pharmacy until August 2012 and did not credit such sales until Q4 2012. See Brooks Dep. 20–21, 63–65. Moreover, Abbott did not add the Kerr Specialty Pharmacy sales data until Q4 2012 because Kerr Specialty Pharmacy sales data did not meet Abbott's $1.5 million threshold. See Lindsay Dep. 119–21, 124–25. Thus, Abbott did not include such sales, in accordance with its own policies. Id. Furthermore, and in any event, Abbott's reserved discretion in the criteria documents and the Powerpoint presentation concerning the calculation and payout of such bonuses defeats McCabe's NCWHA claim.

As for McCabe's claim concerning the post-pay adjustment payout that Abbott made on June 7, 2012, McCabe was no longer on the payroll on that date. See McCabe Dep. 20–21. Thus, under the Abbott criteria documents, she was ineligible.

In support of her NCWHA claim, McCabe contends that Abbott violated N.C. Gen. Stat. § 95-25.13(3) by failing to tell her that she would forfeit incentive compensation if she was not on the payroll. Section 95-25.13 states: "Every employer shall: Notify employees, in writing or through a posted notice maintained in a place accessible to its employees, at least 24 hours prior to any changes in promised wages. Wages may be retroactively increased without the prior notice required by this subsection." N.C. Gen. Stat. § 95-25.13(3). The criteria documents and Powerpoint presentations, however, were available to employees via Abbott's intranet system and they state that

12

an employee had to be on the payroll to be eligible to receive any incentive compensation. See, e.g., Brooks Decl. ¶¶ 7–8, Exs. A–C; McCabe Dep. 31–33. Thus, Abbott did not violate section 95-25.13(3).

McCabe argues to the contrary and cites Kornegay v. Aspen Asset Group, LLC, 204 N.C. App. 213, 693 S.E.2d 723 (2010), and Arndt v. First Union National Bank, 170 N.C. App. 518, 613 S.E.2d 274 (2005). In Kornegay, the employer notified the plaintiff that it would not pay any bonuses until the employer "sees fit & confident we are making money." Kornegay, 204 N.C. App. at 218, 693 S.E.2d at 729. The North Carolina Court of Appeals held that, under section 95-25.13(3), the forfeiture notice was not sufficient to defeat the employee's entitlement to a bonus because the notice "did not specify 'the conditions for loss or forfeiture' of plaintiff's bonuses." Id. at 228–32, 693 S.E.2d at 735–37. In contrast to Kornegay, Abbott's criteria documents state: "All incentive plan participants must be on active payroll with the company on the payment date in order to qualify for a bonus earned." Brooks Decl. ¶ 8, Ex. C. Likewise, the criteria documents state: "Individuals whose employment with Abbott terminates, or who are not actively employed or on active payroll on the payment date for any reason, as determined by Abbott, will not be eligible to earn and will not receive a Sales Bonus." Brooks Decl. ¶ 7, Exs. A–B. Accordingly, Abbott's notice complied with section 95-25.13(3).[1]

As for Arndt, the evidence in Arndt "showed plaintiff's bonus and compensation structure was unique to him and different from the generic [bonus] plans applicable to defendants' other

---

[1] The court rejects as speculative McCabe's assertion that Abbott moved the post-pay adjustment payout for North Carolina sales representatives from May 24, 2012, to June 7, 2012. See Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. [D.E. 30] 11. McCabe's contention is not only speculative but confuses the Q1 2012 bonus payment of May 24, 2012 (which Abbott properly applied to McCabe's 2011 negative balance), and the Q1 2012 post-pay adjustment payout of June 7, 2012. See Lindsay Dep. 308–11.

13

employees. [Thus,] [t]he [forfeiture] notices defendants assert were provided in accordance with the NCWHA did not apply to plaintiff." Arndt, 170 N.C. App. at 524–25, 613 S.E.2d at 279. Unlike in Arndt, McCabe's bonus structure was not unique to her and the forfeiture notice in the criteria documents applied to her. Accordingly, the court grants summary judgment to Abbott on McCabe's NCWHA claim.

Finally, the court addresses McCabe's unjust enrichment claim. McCabe asserts that "[i]n the event that the Court finds that there was no contract, Plaintiff has pleaded in the alternative a claim for unjust enrichment." Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. 15; see Compl. ¶¶ 33–36. McCabe then argues that Abbott received the benefit of hundreds of thousands of dollars of Kerr Specialty Pharmacy Humira sales due to McCabe's efforts, that McCabe expected to receive incentive compensation for her efforts, and that Abbott has been unjustly enriched. See Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. 15–16.

Under North Carolina law, an unjust enrichment claim has five elements:

> First, one party must confer a benefit upon the other party. Second, the benefit must not have been conferred officiously, that is it must not be conferred by interference in the affairs of the other party that is not justified in the circumstances. Third, the benefit must not be gratuitous. Fourth, the benefit must be measurable. Last, the defendant must have consciously accepted the benefit.

JPMorgan Chase Bank, Nat'l Ass'n v. Browning, 750 S.E.2d 555, 559 (N.C. Ct. App. 2013) (quotations and citations omitted). Under North Carolina law, an unjust enrichment claim is "a claim in quasi contract or a contract implied in law." Rev O, Inc., v. Woo, 725 S.E.2d 45, 49 (N.C. Ct. App. 2012). "If there is a contract between the parties[,] the contract governs the claim and the law will not imply a contract." Booe v. Shadrick, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988).

Abbott paid McCabe her salary throughout the time that she worked as an Abbott sales representative in 2011 and 2012. See McCabe Dep. 61–62. Although McCabe was employed at

14

will, an at-will employment relationship is a contract of indefinite duration that either party can terminate at anytime. See, e.g., Kurtzman v. Applied Analytical Indus., Inc., 347 N.C. 329, 331, 493 S.E.2d 420, 422 (1997); Burley v. U.S. Foods, Inc., 756 S.E.2d 84, 89 (N.C. Ct. App. 2014); accord Spriggs v. Diamond Auto Glass, 165 F.3d 1015, 1018 (4th Cir. 1999) (applying Maryland law). Thus, a contract existed between McCabe and Abbott during her employment in 2011 and 2012 under which McCabe worked to persuade physicians to prescribe Humira in exchange for a base salary and the possibility, at Abbott's discretion, of bonus compensation. Simply put, "[Abbott] was not unjustly enriched by [McCabe] performing the job she was paid a salary to perform." Dulaney v. Inmar, Inc., 725 S.E.2d 473, 2012 WL 1514746, at *4 (N.C. Ct. App. May 1, 2012) (unpublished table opinion); cf. Booe, 322 N.C. at 570, 369 S.E.2d at 556; Rev O, Inc., 725 S.E.2d at 49. Accordingly, the court grants summary judgment to Abbott on McCabe's unjust enrichment claim.

III.

In sum, the court GRANTS defendant's motion for summary judgment [D.E. 25]. The clerk shall close the case.

SO ORDERED. This 19 day of September 2014.

JAMES C. DEVER III
Chief United States District Judge

15